UNITED STATES BANKRUPTCY COURT
FOR THE
DISTRICT OF MASSACHUSETTS

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

In re
**BB ISLAND CAPITAL, LLC,**                                  Chapter 11
    Debtor                                              Case No. 15-13105-JNF

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

**MEMORANDUM**

**I. INTRODUCTION**

The matter before the Court is the Motion of East Boston Savings Bank for Relief from the Automatic Stay pursuant to 11 U.S.C. § 362(d)(1) and (d)(2) (the "Lift Stay Motion"). Specifically, East Boston Savings Bank ("EBSB") seeks to foreclose on real property located at 173B Norfolk Avenue, Boston, Massachusetts; 30-40 Batterymarch Street, Boston, Massachusetts; 261 Marlborough Street, Unit 5, Boston, Massachusetts; and 239 Commonwealth Avenue, Unit 10, Boston Massachusetts (collectively, the "Four Properties"). It maintains that there is cause for relief from the automatic stay under 11 U.S.C. § 362(d)(1) because BB Island Capital, LLC ("BB Island" or the "Debtor") cannot adequately protect its interest in the Four Properties, as well as under 11 U.S.C. § 362(d)(2) because the Debtor has no equity in the Four Properties and "no reorganization is reasonably within prospect." The

1

Debtor opposes the Lift Stay Motion.

The Court heard the Lift Stay Motion on September 16, 2015 and on October 7, 2015 and directed the parties to file supplemental documents.  Having reviewed the Lift Stay Motion and the Debtor's Response, as well as the parties' supplemental submissions, the Court concludes that the material facts necessary to determine whether EBSB has sustained its burden with respect to the Lift Stay Motion are not in dispute, although circumstances surrounding the stalled development of the property located at 20 Parmenter Street and 244-246 Hanover Street, Boston, Massachusetts (the "Project") have raised, and likely will continue to raise, considerable controversies among EBSB, Whipple Construction ("Whipple"), Hanover Parmenter Union LLC ("Hanover Parmenter"), and the Debtor because the Four Properties owned by the Debtor are pledged to secure its guaranty of Hanover Parmenter's debt to EBSB.

## II. FACTS

The material facts needed to resolve the Lift Stay Motion are either admitted by the Debtor in its Response to the Lift Stay Motion or set forth in the Verified Complaint and Request for Injunctive Relief it filed against EBSB in the Suffolk Superior Court, Department of the Trial Court on July 30, 2015.  The denial of injunctive relief by the Superior Court precipitated the filing of the Debtor's Chapter 11 case on August 4, 2015.

In 2008, Twenty P. Realty Trust, 244 VFW Trust, and Joseph F. Perroncello ("Perroncello"), who holds a 99% interest in the Debtor and who was the trustee of the two trusts, borrowed $9,570,000.00 from EBSB to finance the Project, which at the time was to

consist of 2 buildings located at 20 Parmenter Street and 244-246 Hanover Street and to include 18 residential units, 6-7 retail spaces, and 25 underground parking spaces. Permitting delays in connection with an underground lift for the parking areas and other issues delayed the Project, and Perroncello and the two trusts defaulted on their obligations. The loan matured in 2011 before completion of the Project.

EBSB agreed to refinance the Project, but conditioned the refinancing upon the engagement of Whipple and the conveyance of the Project to a new entity, Hanover Parmenter, whose members are Silvermine Development Partners, LLC ("Silvermine") and the Debtor. Alyson Toombs Worthington ("Toombs") is the Manager of Hanover Parmenter; Geoffrey Evancic ("Evancic"), an officer of Whipple, was until recently the manager of the Debtor.

On April 13, 2012, EBSB entered into an agreement with Hanover Parmenter for a loan in the amount of $16,423,000.00, some of the proceeds were used to pay off the existing loan. In addition, the two Perroncello controlled trusts transferred title to the Project to Hanover Parmenter. Hanover Parmenter signed a promissory note in favor of EBSB in the amount of $16,423,000.00, which note was secured by a mortgage on the Project, i.e., the properties located at 244-246 Hanover Street and 20 Parmenter Street.

The Hanover Parmenter note was guaranteed by the Debtor[1] and the guaranty, which is dated April 13, 2012, was secured by first mortgages on the Four Properties (the

---

[1] The Note also was guaranteed by Toombs, but her guaranty is limited to $3 million and requires EBSB to pursue foreclosure of the Four Properties before it can pursue her guaranty.

3

"Guaranty"). Titles to the Four Properties were transferred to the Debtor which was formed for the purpose of managing them. In order to pay off existing loans on the Four Properties, EBSB and the Debtor entered into a loan agreement whereby, on April 20, 2012, the Debtor executed a promissory note made payable to EBSB in the amount of $1,741,631.00 and granted EBSB a second mortgage on the Four Properties. On May 4, 2012, the Debtor entered into another transaction with EBSB whereby it borrowed an additional $14,472.33, executed a promissory note, and granted EBSB a third mortgage on the Four Properties. On May 1, 2015, however, EBSB filed a subordination of the first mortgage securing the Guaranty to the April 20, 2012 mortgage and the May 4, 2012 mortgage that was recorded at the Suffolk County Registry of Deeds. The effect of the subordination was to make the April 20, 2012 mortgage the first mortgage, the May 4, 2012 mortgage the second mortgage, and the mortgage securing the Guaranty the third mortgage.

The Debtor's April 13, 2012 Guaranty of the Hanover Parmenter note was executed by Evancic as "Manager and authorized signatory," and provides in pertinent part the following:

> This Guaranty is an absolute, unconditional and continuing guaranty of the full and punctual payment and performance by the Borrower [Hanover Parmenter] of the Obligations, including any future advances made to Borrower pursuant to the Note and the other Loan Documents, and not of their collectibility only and is in no way conditioned upon any requirement that the Bank first attempt to collect any of the Obligation from the Borrower or any other party primarily or secondarily liable with respect thereto or resort to any security or other means of obtaining payment of any of the Obligations which the Bank now has *or may acquire after the date hereof*, or upon any other contingency whatsoever. The obligations of the Guarantor hereunder shall remain in full force and effect until all amounts due pursuant to the Note and the other Loan Documents have been paid in full.

4

\*\*\*

*The liability of the Guarantor hereunder shall be unlimited in amount.*

(emphasis supplied).

According to the Debtor, EBSB "ran the construction project," but at present only the building located on Parmenter Street is partially completed and the real estate on Hanover Street is a vacant lot. In September of 2013, due to EBSB's alleged mismanagement of the Project, Hanover Parmenter and the Debtor demanded that Whipple be terminated and that Hanover Parmenter be allowed to manage the Project, a demand EBSB rejected. Nevertheless, on December 30, 2013, the Debtor executed an "Amendment of Unlimited Guaranty of BB Island Capital LLC." The amendment contained the parties' alleged recognition that the loan amount was to be increased from $16,423,000.00 to $18,700,000.00. EBSB submitted the affidavit of Evancic who, while noting that a formal Consent of Members document had not been executed, represented the following:

> The additional funding was sought by Hanover Parmenter because it had changed its plans for the Project. Mr. Perroncello was aware of the changes to the project and the increase of residential units from 18 to 28 units and he was aware that EBSB would require that BB Island execute the Amendment as part of the increased loan arrangement for the additional funds to complete the additional units.
>
> Prior to my execution of the Amendment, Mr. Perroncello consented to having BB Island execute it and guaranty the increase in the loan amount.

Perroncello, in his affidavit, stated that "I was never made aware of or participated in any vote to amend the Guaranty . . . or to modify the underlying loan." He also stated that no vote took place and that he was not aware of, or signed, any written Consent to amend the

5

Guaranty. In response, EBSB filed another affidavit executed by Evancic to which he attached an email chain demonstrating Perroncello's awareness that the amount of the loan to Hanover Parmenter was to be increased, although no formal written consent was executed.

The Debtor failed to pay sums due under the April 20, 2012 and May 4, 2012 notes and, on December 8, 2014, EBSB accelerated the loans and demanded full payment. When the Debtor failed to pay, it sent the Debtor notices of its intent to foreclose and to conduct foreclosure auctions. The Debtor and EBSB dispute whether the Debtor paid $600,000 to postpone the auctions of the Four Properties for sixty days.

On July 30, 2015, the Debtor filed its Verified Complaint in the Suffolk Superior Court. Based upon its claims that EBSB controlled and mismanaged the Project, it formulated four counts as follows: Count I - Breach of Fiduciary Duty; Count II - G.L. c. 93A; Count III - Equitable Estoppel; and Count IV - Injunctive Relief. Specifically, it alleged that EBSB should be estopped from foreclosing on the additional collateral, namely the Four Properties, because of its representations that it would complete the Project. The Superior Court heard the request for preliminary injunctive relief. Its denial of that request precipitated the filing of the Debtor's bankruptcy petition.

In its Lift Stay Motion, EBSB states Hanover Parmenter defaulted on its obligations to EBSB by, among other things, failing to make payment as and when due, adding that the Hanover Parmenter loan matured on May 1, 2015. According to EBSB, the total amount due as of the Debtor's filing date of the petition was $16,899,549.27, a sum in excess of the face amount set forth in the original Guaranty ($16,423,000.00 - $16,899,549.27 = $476,549.27).

EBSB also contends that the Debtor is liable to it for the full amount due under the April 20, 2012 and May 4, 2012 loans in the amount of $1,342,737.95 ($1,317,041.16 + $15,696.79). In its view, the Debtor is liable for a total of $18,242,287.22.

The Debtor takes issue with EBSB's calculation of the amount due under the April 20, 2012 loan.[2] Without any specificity, it challenges the default rate of interest, auctioneer's fees and late charges. It admits that $15,696.79 is owed under the May 4, 2012 loan. With respect to the Hanover Parmenter loan it guaranteed, it denies owing $16,899,549.27, again challenging the default interest, late charges and legal fees.[3]

EBSB, based upon appraisals it obtained for the Four Properties, asserts that the Four

---

[2] According to EBSB, as of August 4, 2015, it is owed $1,317,041.16 in connection with the April 20, 2012 loan to the Debtor, calculated as follows:

|      |                    |              |
|------|--------------------|--------------|
| i.   | Principal          | $1,139,118.77 |
| ii.  | Interest           | 52,255.61    |
| iii. | Default Interest   | 64,947.59    |
| iv.  | Late Charges       | 6,316.92     |
| v.   | Legal Fees         | 27,506.34    |
| vi.  | Environmental Fees | 445.00       |
| vii. | Auction Fees       | 11,580.00    |
| viii.| Escrow Balance     | 14,870.93    |
|      | Total              | $1,317.041.16 |

[3] According to EBSB, as of August 4, 2015, it is owed $16,899,549.27 in connection with its Guaranty of the Hanover Parmenter note, calculated as follows:

|      |                  |               |
|------|------------------|---------------|
| i.   | Principal        | $16,330,162.34 |
| ii.  | Interest         | 312,943.15    |
| iii. | Default Interest | 215,467.42    |
| iv.  | Late Charges     | 17,467.36     |
| v.   | Legal Fees       | 13,759.00     |
| vi.  | Appraisal Fees   | 9,750.00      |
|      | Total            | $16,899,549.27 |

Properties have a combined value of $3,465,000, which the Debtor admits. It also contends that the Four Properties are encumbered by tax liens totaling approximately $170,000, which the Debtor also admits and, with respect to one property, a condominium lien, which the Debtor disputes. In addition, EBSB contends, based upon comprehensive appraisals prepared by Cushman & Wakefield, one dated December 17, 2014 for 20 Parmenter Street, and the other dated April 2, 2015 for 244 Hanover Street, that the Project has a total value of $14,100,000.00. The Debtor disputes this assertion, but provided no reasoning or justification for its position. Indeed, it did not challenge a single aspect of the appraisals provided by EBSB which would undermine their validity.

The Debtor argues that EBSB is not entitled to relief from stay, asserting that "the overall collateral package to the Bank indicates that they [sic] are oversecured," that it will provide adequate protection to EBSB, and that "[a] confirmable plan will be filed." It did not outline the adequate protection that it would provide EBSB, although it has been permitted to use cash collateral on an interim basis, nor did it set forth the contours, by way of an offer of proof, of a feasible Chapter 11 plan in prospect or indicate when such a plan would be filed.

The Debtor also challenges the Amendment to the Unlimited Guaranty pointing to a discrepancy in the amendment to the original Guaranty in which its date was referenced as April 13, 2013, instead of April 13, 2012. It adds, based upon Perroncello's affidavit, that the amendment was not authorized.

8

**III. DISCUSSION**

    Section 362(d) provides in relevant part:

(d) On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay–

    (1) for cause, including the lack of adequate protection of an interest in property of such party in interest;

    (2) with respect to a stay of an act against property under subsection (a) of this section, if–

        (A) the debtor does not have an equity in such property; and

        (B) such property is not necessary to an effective reorganization . . . .

11 U.S.C. § 362(d). Section 362(g) provides: "In any hearing under subsection (d) or (e) of this section concerning relief from the stay of any act under subsection (a) of this section-- (1) the party requesting such relief has the burden of proof on the issue of the debtor's equity in property; and (2) the party opposing such relief has the burden of proof on all other issues."

    The Court finds that Hanover Parmenter owes EBSB at least $16,330,162.34 in principal and $312,943.15 in interest, for a total of $16,643,105.49 pursuant to its Guaranty and the amendment thereto, excluding default interest, late charges, legal fees, and all other fees and charges. In addition, the Debtor owes EBSB $1,139,118.77 in principal, plus $52,255.61 in interest, for a total of $1,191,374.38, under the April 20, 2012 note, excluding default interest, late charges and auction fees and other fees challenged by the Debtor. Finally, the Debtor

owes EBSB $15,696.79 under the May 4, 2012 note, a sum the Debtor does not dispute. Thus, the Court finds that the Debtor owes EBSB $ 1,207,021.17 pursuant to the notes it executed on April 20, 2012 and on May 4, 2012, and at least $16,643,105.49 pursuant to its Guaranty as amended. If the sum due under the Guaranty is capped at the face amount set forth in the April 13, 2012 Guaranty, i.e, $16,423,000.00, thereby obviating a determination of the validity of the December 30, 2013 amendment,[4] the total owed would be $17,630,071.17 ($16,423,000.00 + $1,191,374.38 + $15,696.79), without considering outstanding real estate taxes. Juxtaposed against the debt ($17,630,071.17) is property worth $17,465,000.00 ($14,100,000.00 for the Project, plus the undisputed value of $3,465,000 for the Four Properties). Accordingly, the Debtor has no equity in the Four Properties.

Because the Debtor has no equity in the Four Properties, it had the burden of demonstrating that a plan of reorganization is in prospect. It did not sustain its burden.

In <u>United Sav. Assoc. of Texas v. Timbers of Inwood Forest Assocs., Ltd</u>, 484 U.S. 365 (1988), the Supreme Court stated:

> Once the movant under § 362(d)(2) establishes that he is an undersecured creditor, it is the burden of the debtor to establish that the collateral at issue is "necessary to an effective reorganization." *See* § 362(g). What this requires is not merely a showing that if there is conceivably to be an effective reorganization, this property will be needed for it; but that the property is essential for an effective reorganization that is in prospect. This means, as many lower courts, including the en banc court in this case, have properly said,

---

[4] The Court questions whether an amendment was even needed in view of the language of the Guaranty highlighted above. Specifically, the Debtor agreed to guaranty the "Obligations" which EBSB had or "may acquire after the date hereof." In addition, the Guaranty provided that "[t]he liability of the Guarantor hereunder shall be unlimited in amount."

> that there must be "a reasonable possibility of a successful reorganization within a reasonable time." 808 F.2d, at 370-371, and nn. 12-13, and cases cited therein. The cases are numerous in which § 362(d)(2) relief has been provided within less than a year from the filing of the bankruptcy petition. And while the bankruptcy courts demand less detailed showings during the four months in which the debtor is given the exclusive right to put together a plan, see 11 U.S.C. §§ 1121(b), (c)(2), even within that period lack of any realistic prospect of effective reorganization will require § 362(d)(2) relief.

484 U.S. at 375-76 (footnotes omitted). In In re Souza, No. 12-13341, 2012 WL 8441318 (Bankr. E.D. Ca. Nov. 26, 2012), the bankruptcy court observed the following with respect to the standard set forth by the Supreme Court:

> Since the Timbers of Inwood, decision courts have attempted to particularize this standard. The Ninth Circuit Bankruptcy Appellate Panel has embraced a four-part test first articulated in In re Holly's, Inc., 140 B.R. 643, 700 (Bankr. W.D. Mich.1992), which describes the debtor's burden of proof as a "moving target which is more difficult to attain as the Chapter 11 case progresses." *See*, In re Sun Valley–Newspapers, Inc., 171 B.R. 71, 75 (B.A.P. 9th Cir. 1994). The Holly's, court separated the burden of proof into four distinct stages based on when the creditor seeks relief: "The four broad categories can be stated as follows: (1) is it plausible that a successful reorganization will occur within a reasonable time?; (2) is it probable that a successful reorganization will occur within a reasonable time?; (3) is it assured that a successful reorganization will soon occur?; or (4) is it impossible that a successful reorganization will occur within a reasonable time?" Holly's, 140 B.R. at 700 (emphasis original); *see also*, Sun Valley Newspapers, Inc., 171 B.R. at 75.
>
> Holly's, teaches us that the standard articulated in Timbers of Inwood, imposes an increasing burden of proof on the debtor regarding the viability of reorganization as a means of balancing a debtor's need to reorganize against the delay, and consequent harm, imposed on creditors by the stay. Initially the balance favors the debtor in possession. But the burden of proof rapidly shifts in favor of secured creditors, requiring a heightened showing by the debtor of its chances for reorganization. Immediately after the case is filed, a debtor in possession opposing stay relief may offer a "less strenuous" showing of "a reasonable possibility of successful reorganization within a reasonable time." *During this stage, the debtor sustains the burden of proof by offering sufficient evidence that a successful reorganization within a reasonable time is "plausible." The standard is low, requiring the debtor only to present evidence that is "superficially*

> *worthy of belief" that it is capable of producing a plan. The terms of the plan can be obscure and vague, as long as it is plausible that a successful reorganization may occur.* The bankruptcy court's mandate is to balance the reasonableness of the delay borne by the secured creditors against the debtor's ability to formulate a plan. Immediately after the case is filed, if the debtor presents any evidence that a confirmable plan is plausible, the balance favors the debtor and the creditors are expected to wait while the debtor attempts to craft a plan. Holly's, 140 B.R. at 701.

In re Souza, 2012 WL 8441318 at *3 (emphasis supplied). "When the exclusivity period has not yet run, courts apply a lesser standard of proof "to benefit debtors who have a realistic chance of reorganization but who have not had sufficient time to formulate a confirmable plan." In re Morton, No. 3:15-bk-30892, 2015 WL 4396719 at *4 (Bankr. E.D. Tenn. July 17, 2015) (quoting Am. Network Leasing, Inc. v. Apex Pharm., Inc. (In re Apex Pharm., Inc.), 203 B.R. 432, 442 (N.D. Ind. 1996) ("During the early stages of a bankruptcy case, the court 'must work with less evidence than might be desirable and should resolve issues in favor of the reorganization where the evidence is conflicting' to ensure that the debtor is given the 'breathing room' Congress intended the stay to provide.").

Even if this Court were to adopt the lenient standard applicable to the burden of proof under 11 U.S.C. § 362(d)(2)(B) articulated by the court in Souza because the Debtor's case was filed approximately three months ago, the Debtor merely relied upon the conclusory assertion that "[a] confirmable plan of reorganization will be filed." That statement is insufficient to meet the burden articulated by the Supreme Court in Timbers. The Debtor owns the Four Properties and a minority interest in Hanover Parmenter. It did not even attempt to indicate how it could refinance its assets to satisfy its outstanding obligations and reorganize its financial affairs.

To the extent that the Debtor relies upon the argument that the amendment to the Guaranty was faulty, the Court concludes that a determination of the merits of the Debtor's argument as to the lack of authority for the execution of the amendment on December 30, 2013 does not affect the April 13, 2012 Guaranty. Moreover, any assertion that the Lift Stay Motion should be denied because of the pendency of the Superior Court action is without merit in view of the decision of the United States Court of Appeals for the First Circuit in Grella v. Salem Five Cent Savs. Bank, 42 F.3d 26 (1st Cir. 1994). In Grella, the United States Court of Appeals for the First Circuit stated:

> The limited grounds set forth in the statutory language, read in the context of the overall scheme of § 362, and combined with the preliminary, summary nature of the relief from stay proceedings, have led most courts to find that such hearings do not involve a full adjudication on the merits of claims, defenses, or counterclaims, but simply a determination as to whether a creditor has a colorable claim to property of the estate.

Grella, 42 F.3d at 32. In view of the Debtor's failure to draw even a faint outline of a plan of reorganization, coupled with the absence of equity in the Four Properties, the Court concludes that EBSB has established a colorable claim to relief under 11 U.S.C. § 362(d)(2).

**IV. CONCLUSION**

In view of the foregoing, the Court shall enter an order granting EBSB's Lift Stay Motion.

By the Court

*Joan N. Feeney*

Joan N. Feeney
United States Bankruptcy Judge

Dated: November 5, 2015

13